J-S60019-19

2020 PA Super 33

| IN THE INTEREST OF: J.R.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: J.R., FATHER | : : : : : : : : | No. 1263 MDA 2019 |

Appeal from the Decree Entered June 26, 2019
In the Court of Common Pleas of Huntingdon County
Orphans' Court at No:  2019-00004

BEFORE:   SHOGAN, J., STABILE, J., and PELLEGRINI, J.[*]

OPINION BY STABILE, J.:                    **FILED FEBRUARY 11, 2020**

J.R. ("Father") appeals from the June 26, 2019 decree in the Court of Common Pleas of Huntingdon County involuntarily terminating his parental rights to his son, J.R.R. ("Child"), then fourteen years old.[1,2]  Upon careful review, we vacate and remand for further proceedings.

On March 1, 2019, Huntington County Department of Children and Youth Services ("CYS") filed a petition for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a) and (b).  The orphans' court held a hearing on June 21, 2019, during which CYS presented the

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Child was born in April of 2005.

[2] P.R. ("Mother") voluntarily relinquished her parental rights, and the orphans' court entered a decree terminating them on June 26, 2019.

testimony of its caseworker, Lori Deline, and H.W., Child's foster mother. Father testified on his own behalf *via* telephone from State Correctional Institute ("SCI")-Somerset. During the hearing, Michael M. Kipphan, Esquire, represented Child's legal interests, and the Guardian *ad litem* ("GAL"), Robert M. Covell, Esquire, represented Child's best interests. The testimonial evidence revealed as follows, in relevant part.

The juvenile court placed Child in the emergency protective custody of CYS on February 2, 2017, due to a "drug bust" at Mother's home. N.T., 6/21/19, at 2-3. At that time, Father was incarcerated at SCI-Somerset, where he had been since approximately 2007, for crimes involving robbery and aggravated assault for which he was sentenced to a term of incarceration of fifteen to thirty years. *Id.* at 3-4, 32. Father's minimum sentence date is December of 2022, at which time Child will be seventeen years old. *Id.* at 5, 32. Father's maximum sentence date is December of 2037. Trial Court Opinion, 8/6/19, at 4.

Father has not seen Child since he was approximately three years old. N.T., 6/21/19, at 5-6. Father testified that he "repeatedly" requested visitation with Child, but the court denied him. *Id.* at 30. Nevertheless, the foster mother, who is a pre-adoptive resource, testified that Child "has a bond with his dad now that he [has] been longing for that he hasn't had before." *Id.* at 15. She testified on direct examination,

Q. Can you explain that to me?

> A. He said that he didn't get to talk to his dad frequently[,] and his mom moved a lot, so his dad wasn't able to send letters and keep contact[,] and he said now he doesn't have to worry about that. You know, his dad calls frequently. Sometimes more than twice, three times a week. We answer the calls when we're not at the ballfield . . . But everything [has] been positive[,] and I think it [has] done [Child] well . . ., having that relationship that he [has] been missing. It [has] helped him grow as a person.

*Id.*[3] The foster mother testified that Father "gives [Child] positive reinforcement. . . . I remember one time [Child] said . . . dad told me that I was supposed to keep on my toes and do well[,] and . . . it's always important." *Id.* at 18.

On cross-examination by Father's counsel, the foster mother further explained:

> Q. [H]as [Child] expressed to you any anger or sadness about [F]ather?
>
> A. I mean he misses him. He always says, you know, I wish I could see dad. Haven't seen him since I was little. I don't remember [Father], . . . but [Child] talking to [Father] makes [Child] feel better.

*Id.* at 19.

There is no specific testimony about Child's preference regarding the involuntary termination of Father's parental rights, but the foster mother testified that Child wants to maintain a relationship with Father. *Id.* at 19-20. She testified on direct examination:

---

[3] Besides Father, the foster mother testified that Child's paternal grandparents contact him. N.T., 6/21/19, at 22. Child's paternal grandfather, with whom Father's ten-year-old daughter resides, contacts him weekly. *Id.* at 22-23.

- 3 -

Q. If you were to adopt [Child] would you continue to allow [Child] to have communication [with Father]?

A. Yes, most definitely.

Q. You would?

A. Yes.

THE COURT: Do you think that's best for the child?

A. Yes.

*Id.* at 14-15.

However, on cross-examination by Father's counsel, the foster mother testified:

Q. Am I correct that you do not wish to enter into a binding post-adoption visitation?

A. . . . [T]he phone calls, letters, pictures -- I've sent multiple pictures of [Child,] but as far as a binding contract, I don't. I'll continue the contact that we have.

*Id.* at 20.

At the conclusion of the testimonial evidence, Child's counsel stated, in part, on the record in open court:

[M]y client understands that his father is not going to be available as a resource for him in terms of where he lives or who provides his support. He is concerned, Judge, about his connections to his biological family. That's a big deal for him. . . . I feel I need to put on the record that that's a significant concern for [Child], not just with his dad but with his grandfather, his sister who lives with [Child]'s grandfather. . . . And so that's my client's position, Judge.

*Id.* at 37.

- 4 -

In his closing statement, the GAL stated, "For [Child's] own continued growth there is a need for permanency[,] and I think we get there by a termination and an adoption[,] and I don't see that his relationship with [F]ather will change at all with the termination." *Id.* at 36.

By decree dated and entered on June 26, 2019, the orphans' court granted CYS's petition to involuntarily terminate Father's parental rights. Father timely filed a notice of appeal and a concise statement of errors complained of an appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The court filed its Rule 1925(a) opinion on August 6, 2019.

On appeal, Father requests that we review "[w]hether the [orphans'] court lacked sufficient evidence that the proposed adoption was in [C]hild's best interest." Father's brief at 3. Father's argument involves 23 Pa.C.S.A. § 2511(b). Specifically, Father asserts that the record was insufficient for the court to discern the effect on Child of "permanently severing the parental bond with . . . [F]ather." *Id.* at 10. We are constrained to agree.

We review Father's issue pursuant to an abuse of discretion standard, as follows.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

- 5 -

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, Father does not raise Section 2511(a) in the statement of questions involved in his brief. As such, we review the decree pursuant to Section 2511(b) only.[4]  ***See Krebs v. United Refining Company of***

---

[4] The orphans' court involuntarily terminated Father's parental rights pursuant to Section 2511(a)(5) and (8), which provide:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

***Pennsylvania***, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that any issue

not set forth in or suggested by an appellate brief's statement of questions

involved is deemed waived).

Section 2511(b) provides as follows:

. . .

_____

> (5) The child has been removed from the care of the parent
> by the court or under a voluntary agreement with an
> agency for a period of at least six months, the conditions
> which led to the removal or placement of the child continue
> to exist, the parent cannot or will not remedy those
> conditions within a reasonable period of time, the services
> or assistance reasonably available to the parent are not
> likely to remedy the conditions which led to the removal or
> placement of the child within a reasonable period of time
> and termination of the parental rights would best serve the
> needs and welfare of the child.
>
> . . .
>
> (8) The child has been removed from the care of the parent
> by the court or under a voluntary agreement with an
> agency, 12 months or more have elapsed from the date of
> removal or placement, the conditions which led to the
> removal or placement of the child continue to exist and
> termination of parental rights would best serve the needs
> and welfare of the child.
>
> . . .

23 Pa.C.S.A. § 2511(a)(5), (8).  In ***In re C.S.***, 761 A.2d 1197 (Pa. Super.
2000) (*en banc*), this Court held that Section 2511(a)(5) and (8) did not
provide a basis for terminating the father's parental rights in that case when
he was incarcerated at the time of the child's removal from the mother's care.
Pursuant to this well-established case law, the orphans' court in this case
improperly terminated Father's parental rights under the foregoing provisions.
However, because Father did not raise any issue on appeal related to Section
2511(a), we do not reverse the decree on this basis.

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

This Court has explained that, "the needs and welfare of the child are the paramount consideration in deciding whether to terminate parental rights." *In re S.D.T.*, 934 A.2d 703, 706 (Pa. Super. 2007) (citation omitted). Our decisional law recognizes that "[o]ne major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *In re L.M.*, 923 A.2d at 511 (citation omitted). This Court has recognized that "severing close parental ties is usually extremely painful." *In the Interest of K.Z.S.*, 946 A.2d 753, 760 (Pa. Super. 2008). As such, we have stated, "The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* (citation omitted); *see also In re E.M.*, 620 A.2d 481 (Pa. 1993) (order terminating parental rights of the mother reversed by the Pennsylvania Supreme Court where the evidence supported termination under Section

2511(a), but the trial court did not fully explore the emotional needs of the children under Section 2511(b)).

Further, this Court has explained:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)).

Instantly, in its Rule 1925(a) opinion, the orphans' court emphasized that it is, "very impressed with, and greatly commends, the efforts Natural Father has made, and the very important bond he has developed with his son under difficult circumstances." Orphans' Court Opinion, 8/6/19, at 4. The court also found that a parent-child bond exists between the foster mother and Child. Decree, 6/26/19, at ¶ 9.

It is undisputed in the certified record before this Court that a bond exists between Father and Child; moreover, this relationship is beneficial to Child, who was fourteen years old at the time of the subject proceeding. Likewise, the record supports the court's finding that Child shares a bond with

his foster mother;[5] however, there is no evidence that bond supplants Child's need for a relationship with Father. Indeed, the orphans' court recognized this and stated to Father on the record in open court, "There is no doubt in my mind under the law that my decision has to be a termination of your parental rights. . . . In this situation I'm doing it with the comfort of knowing that nothing is going to change for you and your son[,] and I know that when your son is 17, and you have the ability to be paroled, the situation [is] only going to be enhanced." *Id.* at 39.

As such, the court credited the testimony of the foster mother who stated that, if Father's parental rights are terminated, and she adopts Child, she will permit the kind of contact that has been occurring between Father and Child until he reaches majority age, which will approximately be when Father is paroled, his minimum sentence date being December of 2022. N.T., 6/21/19, at 39-40. Although the foster mother testified that she is unwilling to enter into a legally enforceable contract to this effect should she adopt Child, the court found that Child's relationship with Father will not change if Father's parental rights are terminated.

Nevertheless, pursuant to the foregoing well-settled case law, the orphans' court was required to explore what, if any, emotional impact the

---

[5] The CYS caseworker, Ms. Deline, testified that Child is "very well adjusted" in the foster home, where he resides with his brother. N.T., 6/26/19, at 9. There is no testimonial evidence regarding the age of Child's brother. In addition, there is no evidence that Child's brother is Father's natural child.

involuntary termination of parental rights will have on Father's then fourteen-year-old son.  **See In re E.M.**, **supra**.  The record is devoid of evidence in this regard.

Accordingly, we reverse the decree involuntarily terminating Father's parental rights and remand the case for the parties to present evidence regarding Child's preferred outcome in this termination matter and the effect that termination would have on Child.  Subsequent to the presentation of this evidence, the orphans' court shall conduct a proper analysis pursuant to 23 Pa.C.S.A. § 2511(a) and (b).[6]

Decree vacated.  Case remanded for proceedings consistent with this decision.  Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 02/11/2020

---

[6] Based on the record before this Court, there is no evidence that CYS considered changing Child's permanency goal to permanent legal custody pursuant to Section 6351(a)(2.1) of the Juvenile Act, 42 Pa.C.S. § 6351(a)(2.1), rather than adoption.  **See In re S.H.**, 71 A.3d 973 (Pa. Super. 2013).

- 11 -